# UNITED STATES BANKRUPTCY COURT
## SOUTHERN DISTRICT OF MISSISSIPPI

IN RE:  DAVID B. PILGER                           CASE NO. 12-50207-KMS

   DEBTOR                                          CHAPTER 7

MARK WOLGIN,
KENNETH R. DUFF and
ROBERT W. RUSSELL                                 PLAINTIFFS

V.                                                ADV. NO. 12-05018-KMS

DAVID B. PILGER                                   DEFENDANT

## MEMORANDUM OPINION

This matter came before the Court for trial on March 12, 2013, (the "Trial") on the Complaint to Determine Dischargeability (Adv. Dkt. No. 1), Brief (Adv. No. 47) and Reply Brief (Adv. Dkt. No. 50) filed by creditors-plaintiffs Mark Wolgin, Kenneth R. Duff and Robert W. Russell (collectively the "Plaintiffs") and the Answer to Complaint (Adv. Dkt. No. 6) and Rebuttal Brief (Adv. Dkt. No. 49) filed by debtor-defendant David B. Pilger ("Pilger" or the "Defendant").  At Trial, Blewett W. Thomas represented the Plaintiffs and William J. Little, Jr. represented the Defendant.  The Court, having considered the evidence, finds that an award of damages is not warranted for the reasons set forth below.[1]

## I. JURISDICTION

The Court has jurisdiction of the parties to and the subject matter of this Adversary pursuant to 28 U.S.C. § 1334.  This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A), (I), (O). The parties entered a pretrial order asserting jurisdiction pursuant to 28 U.S.C. §§ 1334 and 157. (Adv. Dkt. No. 44).  The Court may enter a monetary judgment in this matter. *Ward*

---

[1] Pursuant to Federal Rule of Civil Procedure 52, made applicable to this Adversary by Federal Rule of Bankruptcy Procedure 7052, the following constitutes the findings of fact and conclusions of law of the Court.

*Family Found. v. Arnette (In re Arnette)*, 454 B.R. 663, 673 (Bankr. N.D. Tex. 2011) (*citing Morrison v. W. Builders of Amarillo (In re Morrison)*, 555 F.3d 473, 479-80 (5th Cir. 2009)).

## II. FINDINGS OF FACT[2]

After Hurricane Katrina, between September and December of 2006, out-of-state Plaintiffs purchased condominium units as investments from Ante Bellum, LLC after a real estate broker employed by the company and certain members of the company, other than the Defendant, represented that the market for corporate rentals was strong. The rental market declined and Plaintiffs ultimately lost their units to foreclosures or short sales. Although Pilger never communicated with the Plaintiffs prior to their individual closings, Plaintiffs allege that the company, through its members and agent, made false and/or fraudulent representations to them that should be attributed to Pilger, that the company transferred units to its members after the Plaintiffs' purchases and without their knowledge and that Pilger submitted false information to Plaintiffs' lenders all in a purported fraudulent scheme to induce Plaintiffs into obtaining financing and purchasing units so that the company could retire a loan that funded rehabilitation of the condominiums.[3]

### A. Stipulated Facts[4]

On February 9, 2006, Ante Bellum, LLC was formed for the purpose of buying certain apartment buildings and converting them into condominium units. The company purchased Carriage House Apartments to rehabilitate into a 102 unit condominium complex.[5] Ante Bellum, LLC renamed the apartments Riverbend Condominiums and employed Robin Spence ("Spence")

---

[2] In the Pretrial Order, the parties stipulated to certain facts, several of which are incorporated herein. Additional facts taken from the record or from testimony at trial have also been included.

[3] The loan was personally guaranteed by certain members of the company, including Pilger.

[4] Stipulated facts are derived from the Pretrial Order. (Adv. Dkt. No. 44).

[5] The company also purchased Ante Bellum Apartments for condominium conversion purposes.

of The Power Broker as listing agent for the sale of the condominium units.[6]  Between October 5, 2006 and December 14, 2006, Plaintiffs Mark Wolgin, Kenneth R. Duff and Robert W. Russell purchased units in Riverbend Condominiums without reviewing the Homeowners' Association Certifications ("HOA Certification(s)") for their respective units prior to closing. Pilger did not represent any of the Plaintiffs in any capacity regarding the purchase of their units. Subsequent to the Plaintiffs' purchases, Ante Bellum, LLC conveyed the remaining unsold units to its members.[7] (Exs. 11-14)

**B.  Facts at Trial**

    **1. Defendant Pilger's Testimony**

At the time each of the Plaintiffs purchased their respective units, Pilger, a licensed attorney, was managing member of Ante Bellum, LLC for purposes of signing deeds upon the sale of units.[8]  He also signed five or six HOA Certifications that were supplied by lenders of potential purchasers in connection with condominium sales.  Other members of the company were assigned specific titles and duties based on each of their respective areas of expertise. For instance, Greg Stewart was in charge of construction, as his company, Madison Homes, completed the rehabilitation.

Prior to the Plaintiffs' purchases, several units at Riverbend Condominiums were sold. On December 21 and 23, 2006, after Plaintiffs' purchases and after the market for corporate rentals declined, Ante Bellum, LLC transferred the remaining 40 unsold units to its members;

---

[6] Riverbend Condominiums, Inc. was created for the operation of the Homeowner's Association for Riverbend Condominiums.

[7] The original members of the company include Todd Delano, Barbara Delano, Greg Friedlander, Greg Stewart and David Pilger. Ante Bellum, LLC conveyed 8 units to Pilger on December 21, 2006, the remaining members obtained their units on December 23, 2006.

[8] Pilger also served as president of the Riverbend Homeowners Association. Plaintiffs stipulated that the Homeowners Association did not have any contact with them prior to their purchases.

each member received eight units.  Pilger's undisputed testimony established that the decision to transfer the units was made about two weeks to one month before the actual transfer to accommodate differences of opinion by the members as to whether the units should be sold, rented, mortgaged, etc., with the understanding that the members would be on the bottom of the rental list, if any of them rented their units.  Pilger obtained eight units that he later mortgaged, one of which he sold, some of which he allowed family and friends to occupy and some of which were rented.  In October of 2010, Pilger lost his units to foreclosure.  Pilger attributed the downturn in the corporate rental market to the holiday season and massive conversions of other apartments in the area into corporate rentals flooding the market with excess supply.

### 2. Plaintiff Mark Wolgin's Testimony

Plaintiff Mark Wolgin ("Dr. Wolgin") learned about Riverbend Condominiums after a fellow member of a California real estate investing club referred him to Spence for the purpose of investing in reconstruction and "Go Zone"[9] projects for profit.  According to Dr. Wolgin, Eric Leath ("Leath"), Spence's associate, explained to him that there was a strong positive cash flow possibility for corporate apartments based on a number of factors, including that FEMA agents and shipyard workers were receiving housing subsidies of $2,200 per month.  Upon visiting the complex in June of 2006, Dr. Wolgin met with Stewart, who generally confirmed the need for corporate housing but did not make any guarantees as to the viability of such investment.[10]  On the same day, Dr. Wolgin gave a $1,000 earnest deposit for the purchase of a unit and later

---

[9] "Go Zone" or "Gulf Opportunity Zone" refers to the portion of the Hurricane Katrina disaster area warranting individual and/or public assistance from the Federal Government. 26 U.S.C. § 1400M(1). Go Zone projects meeting certain requirements are eligible for tax benefits. 26 U.S.C. § 1400N. Ultimately, Dr. Wolgin did not participate in the Go Zone program.

[10] Dr. Wolgin acknowledged that Stewart's statements were forward looking.

closed on the sale by mail on December 14, 2006, without reviewing the purported HOA Certification sent to his lender.

After purchasing his unit in December of 2006, Dr. Wolgin's unit was rented on a month-to-month basis until approximately October 2010, for a total of 18 months with the longest tenant renting for three to four months.[11]  Eventually, in 2010, Dr. Wolgin disposed of his unit by short sale.  Dr. Wolgin represented that, as an out-of-state investor unfamiliar with the Gulf Coast real estate market, he relied on statements by Stewart and Leath about the local market that should be imputed to Pilger.  Dr. Wolgin asserts that he is entitled to damages in the amount of $64,800, which includes legal fees, that should be excepted from discharge under § 523(a)(2)(A).[12]

### 3. Plaintiff Kenneth R. Duff's Testimony

Plaintiff Kenneth R. Duff ("Duff"), a self-proclaimed, trained real estate investor from California,[13] visited the Gulf Coast in 2006 to look at investment properties.  In July of 2006, he met with Spence and Leath to view properties in Alabama and Mississippi.  During July 2006 to September 2006, Spence, Leath and Stewart each represented to Duff, on different occasions, that there was a strong demand for corporate rentals and that the investment would cash flow.  Duff initially became hesitant about the investment but decided to purchase after speaking with a friend who told him that there was a corporate unit available at Riverbend Condominiums.  On October 11, 2006, after having his personal financial planner review the potential investment, Duff purchased unit number 20 furnished.  Stewart subsidized the first two months of rent and

---

[11] The Power Broker managed Dr. Wolgin's unit in 2007, under a separate contract, until CTC Management took over managing the unit.

[12] Dr. Wolgin testified as to the amount of his damages without providing any income statement or other document detailing how the amount was calculated.

[13] Duff testified that he had purchased over 10 real estate investment properties in the past, all of which were lost to foreclosures or short sales.

then a corporate tenant rented the unit for about five to six months. Eventually, the market for rentals declined and, in 2007 or 2008, Duff ceased renting his unit due to difficulty in obtaining tenants. Duff maintained that he relied on statements about the corporate rental market and that the investment would cash flow at $2,200 per month in deciding to purchase his unit and that the statements were ultimately untrue. Duff asserts that he is entitled to damages in the amount of $15,000, which includes closing costs and legal fees, that should be excepted from discharge under § 523(a)(2)(A).[14]

### 4. Plaintiff Robert W. Russell's Testimony

Plaintiff Robert W. Russell ("Russell"), an investor from California, learned about Riverbend Condominiums through Spence and Leath, with whom he had a prior business relationship.[15] In 2006, Spence, acting as a dual agent,[16] and Leath escorted Russell to various properties in Mississippi and Alabama for potential investment. At Riverbend, Russell and his father met with Stewart and Leath. At the end of the trip, Russell put five units under contract. Russell began having reservations about purchasing the units, so he visited the property a second time around September of 2006. Despite his reservations, Russell purchased five furnished units on October 3, 2006. Russell testified that after he purchased the units, rent was sporadic; units were rented no more than two or three months per year. Ultimately, Russell lost his units to foreclosure in 2009 and 2010, having collected $66,000 in total rent.

Acknowledging that no one guaranteed that corporate rentals would last into the future, Russell asserted that he relied on Stewart's expertise and knowledge about the rental market and

---

[14] Duff testified as to the amount of his damages, without providing any income statement or other document showing detailing how the calculation was obtained. He seeks only damages relating to the investment, not the foreclosure.

[15] In the past, Russell had purchased a property in Alabama through The Power Broker.

[16] Russell acknowledged that Spence was acting as a dual agent for both himself and Ante Bellum, LLC.

his statements that rentals were expected to last a couple of years because Blackhawk Marine and FEMA were ready to move-in. Russell asserted that he was told that renters were coming, but they never came, at least not at $2,200 per month. Based on this representation, Russell asserts that he is entitled to damages in the amount of $197,097, which includes closing costs (Ex. 8), that should be excepted from discharge under § 523(a)(2)(A).[17]

## III. CONCLUSIONS OF LAW

### A. Evidentiary Objection: Russell-Pilger Meeting

Despite stipulating that Pilger never communicated with any of the Plaintiffs prior to their individual closings, for the first time, at Trial, Russell testified that Pilger was present at a dinner with Russell, Spence, Stewart and certain of Russell's family members on Russell's second visit to the property.[18] Counsel for Pilger objected to the testimony on the basis that Plaintiffs stipulated in the joint Pretrial Order that no Plaintiff had met with Pilger and that Pilger made no statements to any Plaintiff prior to closing. (Adv. Dkt. No. 44). Pilger's counsel also represented that any testimony inconsistent with the stipulation would be detrimental to his case because he relied on Russell's responses to Defendant's request for admissions (Ex. 16), specifically denying any statements between Pilger and Plaintiffs in preparation of his case and in deciding not to depose Plaintiffs prior to Trial.[19] At Trial, the Court allowed Russell to testify regarding the dinner meeting and took the evidentiary objection under advisement.

"A joint pretrial order signed by the court supersedes the pleadings in the case and determines the issues before the court for trial." *Avila v. Perez (In re Perez)*, No. 11-03384, 2012

---

[17] Russell testified as to the amount of his damages, without providing any income statement or other document showing detailing how the calculation was obtained. He does not seek damages relating to the foreclosure but only as to out-of-pocket expenses.

[18] Counsel for Russell represented that he learned about the meeting with Russell the day before Trial.

[19] Counsel also represented that Plaintiffs had not propounded any discovery on Pilger and they did not depose him.

WL 2576393, at *7 (Bankr. N.D. Tex. 2012).  At Trial, Plaintiff's counsel essentially asserted an ore tenus motion to withdraw or amend the admission under Rule 36(b) of the Federal Rules of Civil Procedure.  Pursuant to Rule 36, made applicable by Rule 7036 of the Federal Rules of Bankruptcy Procedure, a court "may permit withdrawal or amendment [of an admission] if it would promote the presentation of the merits of the action and if the court is not persuaded that it would prejudice the requesting party in maintaining or defending the action on the merits." Fed. R. Civ. P. 36(b).  In reviewing a motion to withdraw under Rule 36(b), the court must consider whether withdrawal "would promote the presentation of the merits of the action," and whether withdrawal "would prejudice the requesting party in maintaining or defending the action on the merits." *F.D.I.C. v. Denson*, 3:11CV498TSL-MTP, 2012 WL 5450428, at *13 (S.D. Miss. Nov. 7, 2012) (*citing* Fed. R. Civ. P. 36(b); s*ee also In re Carney,* 258 F.3d 415, 419 (5th Cir.2001)). The plaintiff bears the burden of proof that withdrawal promotes a presentation on the merits and the defendant bears the burden of proof of showing prejudice if the admission is withdrawn. *Casey v. Quality Rests. & Concepts*, Civ. Action No. 1:10CV309-NBB-DASS, 2012 WL 3261367, at *3 (N.D. Miss. Aug. 8, 2012).  Even if both factors are established, the Court has discretion to deny withdrawal or amendment of an admission. *Denson*, 2012 WL 5450428, at *13 (citations omitted).

A determination of whether the testimony should be allowed into evidence is unnecessary because the testimony was irrelevant.  Russell could not recall what was discussed at dinner by anyone or that Pilger made any statements to him at any time.

## B.   11 U.S.C. § 523(a)(2)(A)[20]

Section 523(a)(2)(A) excepts from discharge "any debt for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition." 11 U.S.C. § 523(a)(2)(A); *Norris v. First Nat'l Bank in Luling (In re Norris)*, 70 F.3d 27, 29 (5th Cir. 1995).   "Section 523(a)(2)(A) encompasses three similar grounds for non-dischargeability, all of which apply to 'debts obtained by frauds involving moral turpitude or intentional wrong.'" *Lanier v. Futch (In re Futch)*, Adv. No. 09-00144-NPO, 2011 WL 576071, at *17 (*citing First Nat'l Bank LaGrange v. Martin (In re Martin)*, 963 F.2d 809, 813 (5th Cir. 1992)).   The Fifth Circuit has recognized a distinction in the elements of proof required for false pretenses or false representation with those required for actual fraud.  *AT&T Universal Card Servs. v. Mercer (In re Mercer)*, 246 F.3d 391, 403 (5th Cir. 2001) ("[O]ur court has applied different, but somewhat overlapping, elements of proof for § 523(a)(2)(A) actual fraud, as opposed to false pretenses/representation").[21]

---

[20] The elements for establishing fraud under Mississippi law are similar to that of establishing actual fraud under § 523(a)(2)(A). Generally, to establish fraud under Mississippi law, a plaintiff must show the following by clear and convincing evidence: (1) a representation, (2) its falsity, (3) its materiality, (4) the speaker's knowledge of its falsity or ignorance of its truth, (5) his intent that it should be acted on by the hearer and in the manner reasonably contemplated, (6) the hearer's ignorance of its falsity, (7) his reliance on its truth, (8) his right to rely thereon, and (9) his consequent and proximate injury. *In re Estate of Law*, 869 So. 2d 1027, 1033 (Miss. 2004).   Because the Plaintiffs failed to prove these elements by the lesser standard of a preponderance of the evidence, as required by § 523, Plaintiffs cannot meet the clear and convincing standard under Mississippi law and are not entitled to damages. For brevity, the Court will analyze the case under § 523.

Likewise, the elements for establishing false pretense under Mississippi law are similar to that of establishing false pretense or false representation under § 523(a)(2)(A).

[21] In *Mercer*, the Fifth Circuit questioned whether this distinction survived after *Field v. Mans*, 516 U.S. 59 (1995), but did not resolve the issue as it was not a question before the court.  As the District Court for the Western District of Texas noted, the Fifth Circuit treated the three terms identically in its recent decision *General Electric Capital Corp. v. Acosta (In re Acosta)*, 406 F.3d 367 (5th Cir. 2005); however, it acknowledged the distinction in its unpublished opinion *Jacobson v. Ormsby*, No. 06-51460, 2007 WL 2141961 (5th Cir. July 26, 2007). *See Turbo AleaeInvs., Inc. v. Borschow (In re Borschow)*, 467 B.R. 410 (W.D. Tex. 2012).

Under § 523(a)(2)(A), a representation made by a debtor is a false pretense or false representation if it was: (1) a knowing and fraudulent falsehood; (2) describing past or current facts; (3) that was relied upon by the other party. *In re Mercer*, 246 F.3d at 403; *RecoverEdge L.P. v. Pentecost*, 44 F.3d 1284, 1292-93 (5th Cir. 1995). The subtle distinction between false pretense and false representation is that false representation involves an express statement, whereas false pretense involves conduct that creates a false impression. *In re Futch*, 2011 WL 576071, at *17 (*citing In re Harwood*, 404 B.R. 366, 389 (Bankr. E.D. Tex. 2009)). "[A] mere promise is not sufficient to make a debt non-dischargeable, even if there is no excuse for its subsequent breach." *Bale v. Ryan (In re Ryan)*, 443 B.R. 395, 410 (Bankr. N.D. Tex. 2010) (citations omitted); *see Bank of La. v. Bercier (In re Bercier)*, 934 F.2d 689, 692 (5th Cir. 1991).

In contrast with false pretense or false representation, a party objecting to discharge of a debt under § 523(a)(2)(A) for *actual fraud* must demonstrate that: (1) the debtor made representations; (2) the debtor knew the representations were false at the time they were made; (3) the representations were made with the intention and purpose to deceive the creditor; (4) the creditor actually and justifiably relied on the representations; and (5) the creditor sustained a loss as a proximate result of its reliance. *In re Acosta*, 406 F.3d at 373 (*citing In re Mercer*, 246 F.3d 391, 403 (5th Cir. 2001)); s*ee In re Bercier*, 934 F.2d 689, 692 (5th Cir. 1991) (*discussing* actual fraud under § 523(a)(2)(A) as explained in *In re Roeder*, 61 B.R. 179 (Bankr. W.D. Ky. 1986)); *E. H. Mitchell & Co. L.L.C. v. Alonzo (In re Alonzo)*, Adv. No. 10-1044, 2011 WL 3586123, at *3 (Bankr. E.D. La. Aug. 12, 2011).

The reliance requirement of § 523(a)(2)(A) requires justifiable, not reasonable, reliance. *Field v. Mans*, 516 U.S. 59, 74-75 (1995). Determining whether reliance is justified is a

subjective inquiry that depends on the particular plaintiff and circumstances. *In re Alonzo*, 2011 WL 3586123, at *4.

To except a debt from discharge under § 523(a)(2)(A), a plaintiff must prove each of the required elements by a preponderance of the evidence.[22] *See Grogan v. Garner*, 498 U.S. 279, 287-88 (1991); *In re Acosta*, 406 F.2d at 272.  Exceptions to discharge must be strictly construed against the creditor and liberally construed in favor of the debtor. *In re Futch*, 2011 WL 576071, at *16; *see Mammel v. Pierce (In re Pierce)*, Adv. No. 10-3408, 2011 WL 2312037, *1 (Bankr. N.D. Tex. June 10, 2011); *Fezler v. David (In re Davis)*, 194 F.3d 570, 573 (5th Cir. 1999); *Hudson v. Raggio & Raggio (In re Hudson)*, 107 F. 3d 355, 356 (5th Cir. 1997); *Jordan v. Se. Nat'l Bank (Matter of Jordan),* 927 F.2d 221, 224 (5th Cir. 1991) (rationale of reading nondischargeability provisions narrowly "is to help preserve the Code's basic policy of giving an honest debtor a fresh start").

As an initial matter, in order to hold Pilger liable for statements made by other members of the company and/or its agents (collectively "the LLC"), the Plaintiffs must pierce the corporate veil.[23] *See* Miss. Code Ann. § 79-29-305 (2006)[24]; *see also Rest. of Hattiesburg, LLC*

---

[22] "A fact is proven by a preponderance of the evidence if the Court finds it more likely than not the fact is true." *In re Futch*, 2011 WL 576071, at *16 (*citing EPA v. Sequa Corp. (In re Bell Petroleum Servs., Inc.)*, 3 F.3d 889, 909-10 (5th Cir. 1993)).

[23] According to the Court of Appeals of Mississippi, in order to pierce the veil of an LLC, "the complaining party must prove LLC membership as well as (a) some frustration of contractual expectations, (b) flagrant disregard of LLC formalities by the LLC members, and (c) fraud or misfeasance by the LLC member." *Rest. of Hattiesburg, LLC v. Hotel & Rest. Supply, Inc.*, 84 So. 3d 32, 39 (Miss. Ct. App. 2012) (*citing Gray v. Edgewater Landing, Inc.*, 541 So. 2d 1044, 38-39 (Miss. 1989)).

[24] The Miss. Code. Ann. §79-29-305 in effect in 2006, at the time Plaintiffs purchased their units, provides:

Liability to third parties.

(1) A person who is a member of a limited liability company is not liable, by reason of being a member, under a judgment, decree or order of a court, or in any other manner, for a debt, obligation or liability of the limited liability company, whether arising in contract, tort or otherwise or for the acts or omissions of any other member, manager, agent or employee of the limited liability company.

*v. Hotel & Rest. Supply, Inc.*, 84 So. 3d 32 (Miss. Ct. App. 2012) (LLC treated as corporation for purposes of piercing corporate veil). However, such analysis is unnecessary because even if Plaintiffs establish the elements required to impute statements of the LLC to Pilger, Plaintiffs did not establish all required elements of fraud, false pretenses or § 523 by a preponderance of the evidence.

### 1. Representations About Market Conditions

The fatal flaw in this case is that Plaintiffs failed to establish that representations made to them by the LLC were false or fraudulent. Plaintiffs assert that representations that the market for corporate rentals was strong and would be strong when construction was completed were false; however, Plaintiffs failed to offer any evidence that these representations were false when they were made. Plaintiffs did not challenge the statements about FEMA agents and shipyard workers receiving stipends of $2,200 per month for housing as being untrue when made. To the contrary, the only evidence presented established that these representations were accurate at the time they were made and that the market suffered a decline after Plaintiffs purchased their units due to over saturation of corporate rentals in the area. Furthermore, statements made by the LLC that corporate rental demand was expected to remain strong in the future were mere forward looking statements of opinion. *S. Mortg. Co. v. O'Dom*, 699 F. Supp. 1223, 1226 (S.D. Miss.

---

(2) A member of a limited liability company is not a proper party to a proceeding by or against a limited liability company, by reason of being a member of the limited liability company, except:

    (a) Where the object of the proceeding is to enforce a member's right against or liability to the limited liability company; or

    (b) In a derivative action brought pursuant to Article 11 of this chapter.

(3) Notwithstanding the provisions of subsections (1) and (2) of this section, under a limited liability company agreement or under another agreement, a member or manager may agree to be obligated personally for any or all of the debts, obligations and liabilities of the limited liability company.

Miss. Code Ann. § 79-29-305 (2006).

1987) (fraud may not be predicated on representation as to matters in future; predictions or promises as to future events are not ordinarily sufficient to base actionable fraud). Plaintiffs, all experienced real estate investors, acknowledged that no one guaranteed the viability of their potential investment. Even if the statements were false, Plaintiffs failed to prove that the LLC knew the statements were false at the time they were made and that they were made with intent to deceive.

Likewise, even if the statements were false, the Plaintiffs failed to prove reliance, justifiable reliance or causation. Plaintiffs are all sophisticated, well educated, and experienced real estate investors, who understood that no one can predict the future or guarantee rentals. It appears that Plaintiffs were motivated by Go-Zone benefits and the possibility of making quick, large profits from the shortage of housing on the Gulf Coast after Hurricane Katrina. Dr. Wolgin acknowledged that no one made any guarantees as to the viability of an investment in the condominiums. Duff purchased his unit after speaking with his friend about the corporate rentals and after consulting with his personal financial planner, who reviewed the potential investment. Finally, Russell, who was represented by a real estate agent, asserted that he relied on Stewart's statements that rentals were expected to last a couple of years but acknowledged that no one guaranteed that corporate rentals would last into the future. A misrepresentation not relied upon by the recipient when entering into a transaction in which he suffers a pecuniary loss is not in fact a *cause* of the loss. *In re Baillio*, 7-08-12171 JA, 2010 WL 3782065, at *18 (Bankr. D.N.M. Sept. 21, 2010) (*citing* Restatement § 546, cmt. a) (emphasis added). Moreover, Plaintiffs failed to offer any evidence that their loss was caused by the LLC's representations. If anything, the evidence suggested that Plaintiffs' losses were a result of a declining market for corporate rentals due, in part, to an abundance of new rental developments along the Gulf Coast. Therefore, the

Court finds that Plaintiffs have failed to prove fraud or false pretense to support an award of damages.

### 2. HOA Certifications – Conveyance of Units

Plaintiffs assert that Pilger submitted "inaccurate and misleading condominium certificate[s] concerning the developers' ownership interest in the units . . . and other matters related to the control of the homeowners' association in order to secure the financing of the sale of the condominiums." Compl. at ¶ 12.  Plaintiffs theorize, without providing any basis in fact or law, that the lenders were forbidden from lending to developer controlled condominiums projects and that the allegedly false certificates allowed Plaintiffs to obtain financing when the mortgages should have been declined by the respective lenders due to continuing developer control.[25] *Id.* at ¶15.

At Trial, the only HOA Certifications admitted into evidence pertaining to individual units purchased by Plaintiffs were two versions of the same certification relating to unit 20.[26] Plaintiffs also offered three HOA Certifications/condo questionnaires unrelated to Plaintiffs or their units in an attempt to prove a habit or pattern of providing false information in furtherance of a fraudulent scheme. (Ex. 15).  While the Plaintiffs alleged that Pilger knowingly submitted false HOA Certifications to lenders, the evidence was insufficient to establish any false or fraudulent information on the certifications.  Pilger testified that he communicated with the lenders for instruction on how the certifications should be completed.  He was advised that signed contracts should be counted even if there had been no closing.  Pilger obtained

---

[25] None of the Plaintiffs reviewed their respective HOA Certifications prior to closing.

[26] Plaintiffs alleged that HOA Certifications were required by their individual lenders for use in determining whether to extend a loan.  However, no evidence was provided to establish whether the lenders relied on any statements in the alleged certifications. No representatives of the lenders were present at trial to corroborate the Plaintiffs' allegations.  Plaintiffs stipulated that they did not review their individual HOA Certification(s) prior to closing.

information regarding the number of contracts/sales from the real estate agent.[27]    He also

clarified discrepancies on a duplicate HOA Certification relating to unit 20, as typographical

errors that were corrected and resubmitted to the lender. (Exs. 4, 5).  Pilger further testified that

he signed each of the HOA Certifications in a good faith understanding that they were accurate.

(Exs. 4, 5, 15).  No evidence was presented to show that the information supplied was false or

that the lenders in fact relied on the HOA Certifications when deciding to make the Plaintiffs'

respective loans.  Therefore, the HOA Certifications do not support Plaintiffs' fraud claims.

Plaintiffs also maintain that the LLC's transfer of units to its members was part of an alleged

fraudulent scheme.  However, the evidence at Trial established that the decision to transfer the

units was made after the Plaintiffs' purchases and after the market had declined, to accommodate

differences of opinion between the members as to how the remaining unsold units should be

handled.  The Court finds that the overall evidence is insufficient to prove any scheme to defraud

the Plaintiffs.

## C. Other Matters

The joint Pretrial Order set forth two legal issues not specifically addressed by the parties at

Trial:

> D. Whether Pilger had a duty to disclose any facts to each of the Plaintiffs.
>
> E. Whether each of the Plaintiffs has proven by clear and convincing evidence
> that a fiduciary relationship existed prior to the closing of each of the
> condominium projects between Pilger and each of the Plaintiffs on account of (i)
> the activities of the parties going beyond their operating on their own behalf and
> the activities were for the benefit of both Pilger and each of the Plaintiffs (ii)
> where the parties have a common interest in profit from the activities of the other
> (iii) where the parties repose trust in one another and (iv) where Pilger had
> dominion or control of each of the Plaintiffs.

(Adv. Dkt. No. 44, at ¶ 6(D)-(E)).  Courts routinely find claims abandoned when they are not

presented at trial or in post-trial briefing. *See Faulkner v. Kornman (In re Heritage Org., LLC,*

---

[27] Pilger explained that some potential investors later backed out of their contracts.

466 B.R. 862, 881 (Bankr. N.D. Tex. 2012) (citations omitted).  Because the Plaintiffs did not address or present any evidence on the above issues, the Court finds that the arguments are waived.

## IV. CONCLUSION

For the reasons stated above, Plaintiffs are not entitled to a nondischargeable award of damages under § 523(a)(2)(A).

A separate final judgment will be entered in accordance with Federal Rule of Bankruptcy Procedure 7058.